

No. 3:16-CV-243-CWR-RHW

CARL R. BOATNER,

*Plaintiff,*

*v.*

NANCY A. BERRYHILL,
*Acting Commissioner,*
*Social Security Administration*

*Defendant.*

ORDER AWARDING DISABILITY PAYMENTS

Before CARLTON W. REEVES, *District Judge.*

Carl Boatner spends much of his life waiting.[1] He waits to catch his breath after walking a few dozen steps.[2] He waits for family and friends to assist him in shaving and taking medications.[3] He waits on car rides in rural Mississippi to his many doctor's appointments.[4] He waits in parking lots while others shop for him, afraid of having a medical emergency in public.[5]

Boatner's diagnoses include coronary artery disease, two liver diseases, diabetes, obesity, hypertension, spine disorders, major depressive disorder, and anxiety disorder.[6] In 2015, Boatner received a terminal diagnosis of chronic obstructive pulmonary disease, but survived a months-long stay in hospice care.[7]

Even before entering hospice care, doctors described Boatner as "chronically ill" and "disabled."[8] Between 2011 and 2015, they prescribed him about 17,000 pills.[9] Boatner, now 52, uses oxygen tanks and other devices to help him breathe.[10] He has had a number of strokes and heart attacks, with stents across his heart and liver,[11] and recently had triple-bypass heart surgery.[12] Around 2000, a heart attack ended his two-decade long career as a truck driver.[13] He has not had a steady job since.[14] Boatner last applied for a job in 2015 as a yard hand, but was rejected because the employer thought he "couldn't hold up."[15]

Boatner has spent nearly a decade seeking disability payments from the Social Security Administration, filing his last application in 2014.[16] Despite acknowledging the severity of Boatner's medical conditions and his trips to death's doorstep, the Administration has denied each of his four applications.[17] These denials have been painful. One caused Boatner to walk out of his house, put a gun to his head, and threaten to kill himself.[18]

Boatner filed this lawsuit to challenge the latest denial. No lengthy judicial opinion need resolve that challenge. Boatner plainly qualifies for disability payments.

But Boatner's story is worth telling in full. It reveals a disability payment system tasked with managing millions of cases

each year, yet stripped of the resources to decide those cases fairly. As Justice Thurgood Marshall once wrote, such an "unnecessary barrie[r]" to people with disabilities "stymie[s] recognition of [their] dignity and individuality," and therefore requires careful review.[19] Furthermore, the disability payment system aims to be "as protective of people's dignity as possible,"[20] a purpose "courts must give 'due regard for.'"[21] The Court must explore why, until today, the disability payment system has left Boatner waiting.

## I

### How Could Boatner Qualify for Payments?

By proving to the Administration he met its definition of "disabled."[22] For adult applicants, that definition is the same in both programs that make up the disability payment system, Disability Insurance and Supplemental Security Income.[23] The programs' application procedures are nearly identical, though people qualify for the former by being properly insured and qualify for the latter, as Boatner did, by having very low incomes.[24]

Boatner qualified for disability payments if his long-term medical conditions (those that are expected to be fatal or last more than a year) make someone of his age, education, and work experience unable to do "substantial gainful activity."[25] Such activity is, roughly, work that could generate earnings equal to those of a full time, federal minimum wage job.[26] If there are a "significant number" of jobs in the "national economy" that Boatner could work to make such earnings, he would not qualify for payments.[27]

This definition of disability, written generations ago, has been called long obsolete by scientists and scholars.[28] Under its

cramped structure, the Administration says it "does not mat-
ter" if there is a "lack of work in [the] local area" for Boatner's
body.[29] Nor does it matter if he "would not actually be hired"
for open jobs, even if the "hiring practices of employers" dis-
criminate against him.[30] What matters is Boatner's ability to
prove he had medical conditions that could "reasonably be
expected" to cause "symptoms" that prevent him from earn-
ing a minimum wage living.[31]

Boatner could use many kinds of evidence to prove he had
the right symptoms,[32] but he needed "objective medical evi-
dence" from "acceptable medical sources" to prove he had the
right medical conditions.[33] Such evidence is limited to lab re-
sults or observations by medical professionals using "medi-
cally acceptable clinical diagnostic techniques,"[34] like a doc-
tor's "physical examination."[35] By the end of Boatner's appli-
cation process, the Administration had 914 pages of objective
medical evidence and testimony from doctors, therapists, and
others.[36]

## II

### How Did the Administration Evaluate this Evidence?

By using the five-step process applied to the millions of disa-
bility applications filed each year.[37] The process's first four
steps are shortcuts, created to help staff weed out easy cases
quickly.[38] The two initial steps check whether Boatner lacks a
severe medical condition or is already earning a minimum
wage living.[39] The third step checks if his conditions amount
to "listed impairments," those the Administration thinks
would disable anyone.[40] The fourth step checks if his condi-
tions allow him to work a recently held job.[41] If none of these
shortcuts resolves Boatner's application, the last step checks

if he can earn a minimum wage living given his conditions, age, education, and work experience.[42]

Following these steps can be difficult. For example, seeing if a heart condition amounts to a listed impairment at the third step requires understanding over 11,000 words of instructions.[43] Following those instructions may require searching for hundreds of pieces of evidence, as well as knowing whether evidence has "medical equivalence" to things like "downsloping depression, in the absence of digitalis glycoside treatment or hypokalemia, of the ST segment of at least −0.10 millivolts (−1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead other than a VR."[44] Later steps can be similarly complicated, requiring interpretation of "all of the relevant medical and other evidence" in assessing an applicant's ability to work.[45] In short, following these steps requires medical training, legal fluency, and ample time.

The first person to review Boatner's application was a disability examiner. They and fewer than 10,000 other examiners must decide millions of applications each year.[46] Examiners may need to decide as many as three applications each day.[47] One examiner says this gives them "about two hours to make a decision on a case."[48] Examiners may lack a high school education,[49] and in Mississippi are paid as little as $13 an hour.[50] Examiners "are not medically trained but may consult with a medical consultant."[51] These consultants rarely specialize in the medical conditions they are asked to evaluate.[52] There are far fewer consultants than examiners, and many work part-time.[53] One consultant said it is "accepted agency practice" to sign off on decisions "without reviewing the files or after only a cursory review."[54] The consultant in Boatner's case decided

Boatner lacked severe medical conditions; that decision was justified with only the following: "elev lft's with nl abd, bili-rubin, no ascites, pul-cta, no abnl radiologic studies no mi, no cv sx's. lbp but at recent admit, nt to palpation. nl moto, neuro, ext's dm2 in poor control w/o sig complications."[55]

According to one former administrative law judge (or ALJ), the "cardinal rule" of applying for disability payments is to "appeal everything."[56] Boatner followed this advice as hundreds of thousands do each year, appealing the initial denial to a second examiner.[57] After a second denial, Boatner appealed to an ALJ.[58]

ALJs have an immense caseload that requires them to decide at least ten cases per week.[59] Boatner's ALJ resolved more than 600 cases in 2016.[60] Studies indicate ALJs have fewer than three hours to decide each case.[61] During that time, they have to hold a hearing and read an evidentiary record that averages 655 pages in length.[62] ALJs say that reading every page of evidence is "impossible."[63] The National Academies say it is a "matter of conjecture" whether ALJs are given the resources to make "valid or reliable" decisions involving medical evidence.[64] A recent acting president of the Association of Administrative Law Judges said, "We don't have [the] medical experts that we need. . . . We're kind of in a do-it-yourself operation."[65]

Administration employees can hire an outside medical specialist to evaluate an applicant in person.[66] Here, the Administration hired a psychologist to evaluate Boatner's mental conditions. The psychologist's report concluded that Boatner's "mood, anxiety and personality difficulties" were

"likely to persist for the next twelve months" and "have a significant negative impact on his ability to function in a normal work setting."[67] One would assume the Administration would give reports it paid for great deference. However, the Administration gives ALJs wide latitude to disregard such reports.[68] Boatner's ALJ rejected the psychologist's report as "vague," despite it being nearly 2,000 words in length.[69]

Studies suggest that "the outcome of cases depends more on who decides the case than on what the facts are."[70] Decisions may be based on "ideological views" rather than "the strength of the evidence."[71] One such view is to "generally believe" applicants,[72] and some ALJs may do so uncritically.[73] More often, however, ALJs express an "ingrained skepticism" of applicants.[74] There are more odious biases, too. One ALJ told his staff that "blacks, Hispanics, [and] poor white[s] . . . are drug addicts or alcoholics or have decided to adopt a lifestyle where they just will not work no matter what."[75] This view may be widespread. Research shows that ALJs are more likely to award disability payments to a white applicant than a black applicant with identical medical conditions, symptoms, age, education, and work experience.[76] There is no reason to believe Boatner's ALJ had any nefarious biases. It is worth noting, however, that he issue denials at a rate 25% higher than the national average.[77]

It may be that the decision in Boatner's case was not even written by an ALJ. Decisionwriting is typically outsourced to an attorney or paralegal.[78] One writer said their training consisted of "some videos" and "canned language to use in draft ALJ decisions."[79] This language comes from a Microsoft Word template used to generate generic text in nearly all decisions.[80]

Interestingly, such text makes up about half of Boatner's decision.[81]

ALJs do give writers instructions, but they may "routinely omit basic findings," like how medical conditions affect an applicant's ability to work.[82] Instructions might be simply to "fill in the missing pieces" justifying a denial.[83] Writers usually have no more than eight hours to craft a decision.[84] Some say they have time to read all the evidence, while others admit they only "brows[e] through" it.[85] Such browsing is incompatible with the legal requirement that ALJs "review all of the evidence relevant to [a] claim."[86]

### III

### Did Boatner's ALJ Review the Evidence Properly?

No.

The ALJ properly evaluated the evidence during the first two steps of the sequential evaluation process. He found that Boatner had not worked since filing his application and had "severe" medical conditions that "could reasonably be expected to cause" disabling symptoms.[87] The conditions deemed severe included chronic obstructive pulmonary disease (or COPD), coronary artery disease, two liver diseases, diabetes, obesity, hypertension, major depressive disorder, and anxiety disorder.[88]

In applying the process's third step, the ALJ found that Boatner's severe medical conditions failed to "meet or medically equal the criteria for any listed impairment."[89] Beyond this conclusory statement, there is no evidence the ALJ evaluated Boatner for listed impairments involving his cardiovascular, musculoskeletal, immune, or respiratory systems. The ALJ's

decision only describes evaluating Boatner for "listings 12.04, 12.06, and 12.09," which involve "mental disorders."[90]

At the fourth step, the ALJ accurately found that, since his truck driving career ended long ago, Boatner had "no past relevant work" he could return to.[91]

Turning to the last step, the ALJ found Boatner could work full days at jobs that required him to crawl, walk or concentrate for hour-long periods, and frequently lift and carry 10 pounds.[92] That conclusion, as well as the ALJ's subsequent denial of Boatner's application, was based on a finding that the "evidence in the case record" did not prove he had any "serious and debilitating symptoms."[93]

The ALJ consistently ignored relevant evidence in making this finding. This is reflected in the ALJ's discussion of Boatner's back pain, which is as follows:

> "The claimant testified . . . [s]itting caused pain. . . . In September 2014, the claimaint was seen by Dr. William Perry for a check-up of his chronic conditions and back pain. . . . Dr. Perry advised the claimant to lose weight to help with back pain. . . . An x-ray of the lumbosacral spine in 2011 showed only mild degeneration. . . . During an examination by Dr. Perry in February 2015 . . . [t]here was tenderness in the lumbar spine."[94]

This discussion omits a 2012 physical exam by Dr. Perry, which found abnormalities in Boatner's lumbar spine and led to a diagnosis of "degenerative disc disease."[95] It does not mention a radiologist's conclusion that the 2011 x-ray justified a diagnosis of "mild degenerative spondylosis."[96] It leaves out medical imaging in 2015 that confirmed "degenerative

changes in the spine."[97] It omits hospice nurse reports from 2015 that said Boatner's back pain caused mood swings and limited his ability to stand or walk.[98] And it omits treatment records showing Boatner's back pain is so severe it requires regular treatment with opioid painkillers.[99]

A disturbing pattern of similar omissions appears across the ALJ's decision. While the law requires the ALJ to consider the side effects of medications,[100] it never mentions any of the 15 medications Boatner takes every day, let alone their potential side effects – which include confusion, vomiting, headaches, blurred vision, drowsiness, dizziness, memory problems, nausea, and muscle problems.[101] It never mentions conclusions, based on 2015 medical imaging, that Boatner was likely suffering from "transient ischemic attacks"[102] – that is, mini-strokes.[103] It mentions chest pain once,[104] despite that symptom being the regular cause of Boatner's hospitalizations, with three such trips occurring in 2015 alone.[105]

There are many more omissions of relevant evidence. The most significant are within the ALJ's discussion of Boatner's respiratory problems, which is as follows:

> "The claimant testified . . . COPD caused problems when he got excited [and] used an inhaler five times per day. . . . During an examination by Dr. Perry in February 2015, the claimant had completely normal respiratory [] findings. . . . On June 16, 2015, the claimant . . . had a normal [] respiratory exam [and a] chest x-ray showed no acute cardiopulmonary process. . . . In September 2015, the claimant presented to the emergency room at Baptist Medical Center Leake reporting he could not breathe. He was diagnosed with acute exacerbation of COPD

[and] was noted to be in respiratory distress[.] .
. . In a[n August 2015] letter from the hospice
director [] it was noted that the claimant was ad-
mitted to hospice care due to terminal COPD . .
. he was noted to have extreme shortness of
breath upon any kind of exertion and was de-
pendent on an oxygen concentrator and nebu-
lizer[.] . . . The letter [is] given little weight as it
appears the level of limitation stated in the letter
did not persist for any significant length of time
as the claimant's hospice care was discontinued
in October 2015. . . . While the undersigned
acknowledges severe problems with COPD . . .
since the application date [in October 2014], the
claimant's condition has actually improved."

This discussion deeply understates the duration and severity
of Boatner's respiratory problems. Absent are Boatner's state-
ments in late 2014 that shortness of breath prevents him from
doing housework, carrying more than a few pounds, and
walking without breaks or assistance – even up the few steps
to his camper.[106] It omits a January 2015 hospitalization for
"gradually worsening" shortness of breath.[107] It omits two
January 2015 physical exams revealing abnormal breath
sounds that resulted in diagnoses of shortness of breath and
COPD.[108] It omits medical imaging in June 2015 showing Boat-
ner's lungs had calcified lymph nodes, deflated air sacs, thick-
ened esophageal walls, and emphysema.[109] It omits a June
2015 doctor's report that Boatner was having shortness of
breath during medical procedures.[110] It omits a July 2015 x-ray
showing Boatner's lungs filling with fluid.[111] And it omits July
2015 medical records showing that Boatner's lungs had col-
lapsed.[112]

Furthermore, the ALJ was unjustified in concluding that Boatner's release from hospice meant his symptoms had become non-severe. The hospice provider itself said Boatner was discharged merely because his symptoms had "not declined."[113] Medical research confirms the common-sense idea that being released from hospice care does not release one from disabling symptoms.[114] The ALJ's decision ignored all this, as well as the evidence proving that Boatner still had severe respiratory symptoms after leaving hospice care. It omits a lung exam in the record's final hospice visit report, which found that Boatner was wheezing and expelling "greenish brown" mucus.[115] It omits a nurse's conclusion in that report that Boatner required an inhaler, a nebulizer, oxygen, and "assistance" with "housekeeping, shopping, meal prep, [and] grooming."[116] It omits a later physical exam at a hospital finding Boatner had decreased air movement, wheezing, and "rhonchi," sounds that indicate lung obstruction.[117] Finally, it omits Boatner's November 2015 testimony that he still had up to five episodes a day where he could not breathe.[118]

There is no evidence that could lead the ALJ to conclude that Boatner's severe respiratory symptoms were short-lived. The Court is left wondering what *did* lead to that conclusion.

The evidence the ALJ decided not to omit was often misinterpreted. The ALJ's decision spends a paragraph discussing a "diagnosis of diabetic ketoacidosis" from a September 2015 medical chart.[119] The cited chart says such a diagnosis was "not applicable" to Boatner.[120] The ALJ says that, in a July 2015 report, a doctor described "advis[ing]" Boatner to not "abuse alcohol."[121] The cited report includes no such warning.[122] The ALJ says medical charts from years of treatment at Weems Community Mental Health Center show "[n]o significant

mental status findings."[123] Those charts include over a dozen diagnostic scores,[124] each of which indicate that medical professionals thought Boatner's mental health conditions gave him "moderate" to "serious" trouble thinking, interacting, and working.[125] Such errors frequently leave the Court dumbfounded.

The ALJ never justifies his errors and omissions, with one exception. The ALJ says he ignored Boatner's testimony because of a "complete disregard for his physicians' advice and his own health [shown] by continuing to abuse substances decrease[d his] credibility."[126] True, Boatner has a diagnosis of polysubstance dependence,[127] but – as the ALJ says – there is "no current substantial evidence of substance abuse."[128] Boatner also has a diagnosis of tobacco use disorder,[129] and continues to smoke regularly.[130] One doctor said "his long term-outlook is not good if he continues to abuse tobacco," while another "stressed" that Boatner "stop smoking" to help manage his COPD.[131] Abusing drugs in violation of a treatment plan could disqualify Boatner from receiving disability payments, but only if following that plan would restore his ability to work.[132] There is no evidence this is the case. The ALJ admits as much in finding that Boatner's drug use is "not . . . material to a finding of disability."[133]

Unable to disqualify Boatner directly for his drug addictions, the ALJ transmuted them into a credibility-destroying character flaw. This alchemy is beyond the ALJ's power. The law says ALJs cannot "presume that all claimants with [drug addiction] are inherently less credible."[134] Furthermore, ALJs cannot treat testimony "substantiated by objective medical evidence" as non-credible.[135] Boatner's testimony about his

symptoms was so substantiated. There was no justification for ignoring it.

The ALJ's pattern of omitting relevant evidence is important. The law says each ALJ decision must be supported by "substantial evidence."[136] Boatner appealed the ALJ's decision to this Court, claiming it was "unsupported by substantial evidence."[137]

## IV

### Does Substantial Evidence Support the ALJ's Denial?

No.

The Supreme Court says evidence is "substantial" when a "reasonable mind might accept" it to "support a conclusion"[138] – like whether someone qualifies for disability payments. Substantial evidence thus refers to a specific "quantity" of evidence.[139] That quantity is less than a "preponderance" of evidence, but more than the amount of evidence that creates a "suspicion" something is true.[140] It is unclear how much certainty evidence needs to create in order to be substantial. When 162 federal judges assigned a percentage to that certainty, the figures spread across a wide range, most falling somewhere between 30% certain and 70% certain.[141]

Whatever the precise amount of certainty is, a decision is supported by substantial evidence only when it accounts for "whatever in the record fairly detracts from its weight" and is "justified by a fair estimate" of "the record as a whole."[142] The Fifth Circuit says the substantial evidence rule requires courts in disability cases to "scrutinize the record."[143] Such review ensures the Administration does not weave blankets of fiction from a few threads of fact.

Here, the magistrate judge assigned to review Boatner's case recommended this Court find that substantial evidence supported the ALJ's decision.[144] Boatner objected to that recommendation, arguing that it misapplied the substantial evidence rule.[145] That objection is sustained. The Supreme Court says it not enough for a magistrate to "find in the record evidence which, when viewed in isolation, substantiated the [Administration's] findings."[146] Given that it has been "properly objected to," the magistrate's recommendation is rejected.[147]

When the evidence "conclusively shows [an applicant] is disabled," as it does here, a court in the Fifth Circuit may "reverse and remand with instructions to enter judgment in favor of the claimant."[148] The Administration's decision is therefore REVERSED. The Administration is ORDERED to give Boatner disability payments in line with his application's stated disability onset date of September 24, 2013.[149]

* * *

Doing justice means finding truth. Finding truth takes empathy, expertise, and time. Without those resources, people who decide disability cases are doomed to do injustice.

The injustices of the disability payment system are both many and deep.[150] Research suggests the majority of denials may be incorrect,[151] and applicants struggling to manage their disabilities say such denials can amount to a "death sentence."[152] Even applicants who obtain payments say the system feels like "a game [where] nobody is explaining things to you,"[153] one that forces them to "present an image of being pathetic and helpless."[154] Some say they are "talked down to" by "suspicious" Administration employees, who make them feel like

"non-citizen[s]" for simply exercising their right to seek payments.[155]

Obtaining those payments can take years.[156] Annually, thousands die waiting.[157] As a president of the Association of Administrative Law Judges said, "We have decided it's better for people to die than to adequately fund [the system.]"[158] Those who survive believe the wait "can be just as bad."[159] "I would dutifully fill the packets out and send them back in, and I would hear nothing," one applicant said.[160] "Meanwhile, my medical expenses piled up [and] I could not fill my prescriptions because I simply didn't have the money."[161]

Qualifying for payments can be a hollow victory. The average disability payment made through the Supplemental Security Income program is less than $20 a day.[162] As one recipient said, "[I]t's really demoralizing: you can't afford rent . . . you can barely afford food."[163] Some recipients say they are "kept [in a] cage" by rules that prevent them from working to earn extra money.[164] Others say disability payments merely "allow you to sort of exist in the margins."[165]

These injustices are rooted in a system that refuses to see the needs of people with disabilities as they exist in reality, rather than as they exist in the imaginations of the able-bodied.[166] Those needs are not charity, disdain, or pity. In one woman's words, her needs are simply "enough systems in place [so] that my disability would not limit me or prevent me from having a fulfilling life."[167]

Turning disability payments into one of those systems will require listening to people with disabilities – especially when they say, "Nothing about us without us."[168] Until they are heard, courts must heed Justice Marshall's warning: when the

government "relegate[s] millions of people to lives of poverty and despair," judges "must not shirk [their] duty to enforce the [law] for the benefit of the poor and powerless."[169]

SO ORDERED, this the 11th day of May, 2018.

---

*This opinion includes, wherever possible, hyperlinks to cited sources.*

[1] Transcript of Oral Hearing, Docket No. 8 at 65-118.

[2] *Id.* at 82-83.

[3] *Id.* at 90, 97, 103; Function Report, Docket No. 8 at 261-69; Medication List, Docket No. 8 at 347-51.

[4] Function Report, Docket No. 8 at 261-69; Transcript of Oral Hearing, Docket No. 8 at 65-118.

[5] Transcript of Oral Hearing, Docket No. 8 at 88.

[6] *See generally* Record Evidence, Docket No. 8 at 65-978; *see also* 2015 Administrative Law Judge Decision, Docket No. 8 at 22-28.

[7] Letter from Dr. Cynthia Allen, Docket No. 8 at 593; Kare-in-Home Hospice Care Treatment Records, Docket No. 8 at 841-974.

[8] *See, e.g.,* Report of Dr. William Harris, Docket No. 8 at 703; Report of Dr. Allison Barrett, Docket No. 8 at 385.

[9] Medical Expense Reports from Fred's Pharmacy, Docket No. 8 at 322-36.

[10] Transcript of Oral Hearing, Docket No. 8 at 65-118; Medication List, Docket No. 8 at 347-51.

[11] University of Mississippi Medical Center Records, Docket No. 8 at 603-38; Report or Dr. Manohar Roda, Docket No. 8 at 454; Report of Dr. Rebecca Sugg, Docket No. 8 at 618; *see also* September 2013 Administrative Law Judge Decision, Docket No. 8 at 155-76.

[12] Report of Dr. William Harris, Docket No. 8 at 711.

[13] Field Office Disability Report, Docket No. 8 at 245-50; Work History Report, Docket No. 8 at 273-80; Transcript of Oral Hearing, Docket No. 8 at 65-118.

[14] Field Office Disability Report, Docket No. 8 at 245-50.

[15] Transcript of Oral Hearing, Docket No. 8 at 74.

[16] Field Office Disability Report, Docket No. 8 at 245-50; Application for Supplemental Security Income Benefits, Docket No. 8 at 232-37.

[17] *Id.*

[18] Report of Nurse Practitioner Pamela Watkins, Docket No. 8 at 364.

[19] *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 467 (1985) (Marshall, J., dissenting in part).

[20] *Purpose of Program*, 20 C.F.R. § 416.110.

[21] *McFadden v. Prudential Ins. Co. of* Am., 877 F. Supp. 2d 481, 492 (S.D. Miss. 2012), *aff'd*, 520 *F. App'x* 284 (5th Cir. 2013) (quoting *Ventura v. Shalala*, 55 F.3d 900, 902 (3rd Cir.1995)).

[22] *See* 20 C.F.R. § 416.905 *Basic Definition of Disability for Adults*; 20 C.F.R. § 416.912 *Responsibility For Evidence*.

[23] *Compare* 20 C.F.R. § 416.905 *Basic Definition of Disability for Adults with* 20 C.F.R. § 404.1505 *Basic Definition of Disability*.

[24] Social Security Administration, *Annual Statistical Report on the Social Security Disability Insurance Program, 2016*, SSA Pub. No. 13-11826 at 1-7 (2017).

[25] *Additional Definitions*, 42 U.S.C. § 416; *Basic Definition of Disability For Adults*, 20 C.F.R. § 416.905.

[26] *See What We Mean By Substantial Gainful Activity*, 20 C.F.R. § 41.972; *Evaluation Guides If You Are an Employee*, 20 C.F.R. § 416.974; *Tables of SGA Earnings Guidelines and Effective Dates Based on Year of Work Activity*, DI 10501.015; *see also Considering Substantial Gainful Activity (SGA) and Past Work when Establishing the Established Onset Date (EOD)*, DI 25501.390.

[27] *Work Which Exists in the National Economy*, 20 C.F.R. § 419.966.

[28] *See* National Academies of Sciences, Engineering, and Medicine, *Evolving Concepts of Disability in* Improving the Social Security Disability Decision Process at 18-28 (2007); Frank S. Bloch, *Medical Proof, Social Policy, and Social Security's Medically Centered Definition of Disability*, 92 Cornell L. Rev. 189, 234 (2007); *see also* Edward D. Berkowitz, Disabled Policy: America's Programs for the Handicapped at 41-78 (1987); Matthew Diller, *Entitlement and Exclusion: The Role of Disability in the Social Welfare System*, 44 UCLA L. Rev. 361 (1996).

[29] *Work Which Exists in the National Economy*, 20 C.F.R. § 419.966.

[30] *Id.*

[31] *Basic Definition of Disability for Adults*, 20 C.F.R. § 416.905; *How We Evaluate Symptoms, Including Pain*, 20 C.F.R. § 416.929.

[32] *How We Evaluate Symptoms, Including Pain*, 20 C.F.R. § 416.929; *How We Consider Evidence*, 20 C.F.R. § 416.920b.

[33] *Id.*

[34] *Definitions for This Subpart*, 20 C.F.R. § 416.902.

[35] *See Ivy v. Sullivan*, 898 F.2d 1045, 1048-49 (5th Cir. 1990).

[36] Record Evidence, Docket No. 8 at 65-978.

[37] *Evaluation of Disability of Adults, in General*, 20 C.F.R. § 416.920; *see also* Social Security Administration, *supra* n. 24; National Academies, *supra* n. 28 at 27.

[38] *Accord Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 844 (7th Cir. 2009).

[39] *Evaluation of Disability of Adults, in General*, 20 C.F.R. § 416.920.

[40] *Id.*; *Listing of Impairments in Appendix 1 of Subpart P of Part 404 of This Chapter*, 20 C.F.R. § 416.925.

[41] *Evaluation of Disability of Adults, in General*, 20 C.F.R. § 416.920.

[42] *Id.*; *see supra* n. 24.

[43] *See Listing of Impairments - Listing 4.00 Cardiovascular System – Adult*, C.F.R. Pt. 404, Subpt. P, App. 1.

[44] *See id.*; *Medical Equivalence for Adults and Children*, 20 C.F.R. § 416.926.

[45] *Your Residual Functional Capacity*, 20 C.F.R. § 416.945.

[46] Bernard Wixon and Alexander Strand, *Identifying SSA's Sequential Disability Determination Steps Using Administrative Data*, Social Security Administration Research and Statistics Note No. 2013-01 (2013); Social Security Administration Office of the Inspector General, *Audit Report: Training At Offices That Make Disability Determinations*, Report No. A-01-11-21169 at Table B-1 (2012).

[47] *See* Ronald G. Bernoski, *Statement Before the Subcommittee on Social Security of the House Committee on Ways and Means* (June 28, 2001) (citing 12 cases-per-week figure in California); Texas Senate Committee on Health and Human Services, *Report to the 78th Legislature* at 3.18 (2002) (citing 15-17 cases-per-week figure in Texas); North Carolina Office of Administrative Hearings, *Sheryl P. Morton et al. v. North Carolina Department Of Health And Human Services, Disability Determination Services*, 03 OSP 0840, 0841, 1339 & 1433 (Mar. 1, 2004) (citing 15 cases-per-week figure in North Carolina).

[48] Mike Davis, HOW TO GET SSI AND SOCIAL SECURITY DISABILITY at 61 (2000).

[49] *See* Government Accountability Office, *Social Security Administration: Strategic Workforce Planning Needed to Address Human Capital Challenges Facing the Disability Determination Services*, GAO-04-121 (2004).

50 Social Security Advisory Board, *Chapter 8: State Administrative Arrangements in* DISABILITY CHARTBOOK ([2015](#)).

51 Nicole Maestas et al., *Does Disability Insurance Receipt Discourage Work? Using Examiner Assignment to Estimate Causal Effects of SSDI Receipt*, 103 AM. ECON. REV. 1797 ([2013](#)); *see also Medical Consultants And Psychological Consultants*, 20 C.F.R. § 416.1016 .

52 *See* Clare J. Horan, *The Importance of Specialist Medical Consultants in the SSA Disability Determination Process: Analysis and Proposals*, 102 IOWA L. REV. 1361 ([2017](#)).

53 *See* National Academies, *supra* n. 28 at 4.

54 *See Goodnight v. Chater*, 960 F. Supp. 1538, 1541 (D. Utah 1997).

55 March 2015 Disability Examiner Decision, Docket No. 8 at 185.

56 London Steverson, SOCIALINSECURITY: CONFESSIONS OF A SOCIAL SECURITY JUDGE at 15 (2010).

57 *See* Social Security Administration, *supra* n. 24 at 150.

58 *Evidence, Procedure, and Certification for Payments*, 42 U.S.C. § 405.

59 Harold J. Krent & Scott Morris, *Statistical Appendix on Achieving Greater Consistency in Social Security Disability Adjudication: An Empirical Study and Suggested Reforms*, Administrative Conference of the United States Report at 6 ([2013](#)); *see also* Glenn Sklar, *Testimony Before House Committee on Oversight & Government Reform* ([Nov. 19, 2013](#)); *Ass'n of Admin. Law Judges v. Colvin*, No. 13-CV-2925, 2014 WL 789074, at *1 (N.D. Ill. Feb. 26, 2014).

60 Social Security Administration, *ALJ Disposition Data – FY 2016* (last accessed [Mar. 5, 2018](#)).

61 Cheryl Paullin et al., *Administration Law Judge Work Analysis Study*, HumRRO Report 2015 No. 052 at 69 ([2015](#)); Jonah Gelbach & David Marcus, *A Study of Social Security Litigation in the Federal Courts*, U. Penn Faculty Scholarship Paper 1668 at 36 ([2016](#)); *see also See* Joe Davidson, *Short Staffing Leads to Long Waits for Social Security Disability Hearing Decisions*, WASH. POST, [Apr. 3, 2018](#).

62 Paullin et al, *id.* at iii.

63 Gelbach & Marcus, *supra* n. 61 at 21-22.

64 National Academies, *supra* n. 28 at 107.

65 Chris Stewart, *Lack of Judges, Medical Expertise Slows Disability Cases*, DAYTON DAILY NEWS, [Mar. 3, 2016](#).

66 *When We Will Purchase a Consultative Examination and How We Will Use It*, 20 C.F.R. § 416.919a.

[67] Report of Randy S. Burke, Ph.D, Docket No. 8 at 373.

[68] *Standards for Consultative Examinations and Existing Medical Evidence*, HALLEX II-4-1-2 ([Aug. 1, 1991](#)).

[69] 2015 Administrative Law Judge Decision, Docket No. 8 at 30.

[70] Jerry L. Mashaw et al., SOCIAL SECURITY HEARINGS AND APPEALS: A STUDY OF THE SOCIAL SECURITY ADMINISTRATION HEARING SYSTEM (1978) at xxi (*quoted in Santise v. Schweiker*, 676 F.2d 925, 930 (3d Cir. 1982)); *see also* Government Accountability Office, *Social Security Disability: Additional Measures and Evaluation Needed to Enhance Accuracy and Consistency of Hearings Decisions*, GAO-18-37 ([2017](#)).

[71] Lael R. Keiser, *The Determinants of Street-Level Bureaucratic Behavior: Gate-Keeping in the Social Security Disability Program*, National Public Management Research Conference Presentation ([2003](#)).

[72] *The Disability Mess*, N.Y. TIMES, [May 7, 2009](#).

[73] *See* Damian Paletta, *Disability-Claim Judge Has Trouble Saying 'No,'* WALL ST. J., [May 19, 2011](#).

[74] Gelbach & Marcus, *supra* n. 61 at 79.

[75] *Grant v. Comm'r, Soc. Sec. Admin.*, 111 F. Supp. 2d 556, 560–61 (M.D. Pa. 2000).

[76] *See, e.g.*, Government Accountability Office, *Social Security: Racial Difference in Disability Decisions Warrants Further Investigation*, GAO/HRD-92-56 ([1992](#)); *see also* Jana R. DiCosmo et al., *Interest-Convergence and the Disability Paradox: An Account of the Racial Disparities in Disability Determinations under the SSA and IDEA*, 4 WIDENER J.L. ECON. & RACE 78, 117 ([2013](#)); Erin M. Godtland et al., *Racial Disparities in Federal Disability Benefits*, 24 CONTEMPORARY ECON. POL. 27 ([2007](#)); Government Accountability Office, *SSA Disability Decision Making Additional Steps Needed to Ensure Accuracy and Fairness of Decisions at the Hearings Level*, GAO-04-14 ([2003](#)); Charles O. Thorpe & Richard Toikka, *Determinants of Racial Differentials in Allowance Rates for Social Security Disability Benefits*, 10 REV. BLACK POL. ECON. 397 ([1980](#)).

[77] In fiscal year 2016, ALJs made 521,474 decisions including 236,006 denials, indicating a 45% denial rate. During the same period, Boatner's ALJ made 482 decisions including 269 denials, indicating a 56% denial rate. *See* Social Security Administration, *ALJ Disposition Data FY 2016* (last accessed [Apr. 1, 2018](#)).

[78] Gelbach & Marcus, *supra* n. 61 at 23-27; *Instructions to Decision Writers*, HALLEX I-2-8-20 (last updated [Mar. 10, 2016](#)).

[79] *See Cade v. Astrue*, No. 2:11-CV-03498-PMD-BM, 2014 WL 4635568, at *14 (D.S.C. Sept. 15, 2014) (internal quotation marks omitted).

[80] Gelbach & Marcus, *supra* n. 61 at 27; Social Security Administration Office of the Inspector General, *The Social Security Administration's Efforts to Eliminate the Hearings Backlog*, Report No. A-12-15-15005 at 7 (2015).

[81] *See* December 2015 Administrative Law Judge Decision, Docket No. 8 at 17-37.

[82] Gelbach & Marcus, *supra* n. 61 at 25.

[83] *Boland v. Astrue*, No. 3:08CV798-HEH, 2009 WL 2431536, at *8 (E.D. Va. Aug. 7, 2009).

[84] Gelbach & Marcus, *supra* n. 61 at 14, 27.

[85] *Id.* at 26.

[86] *How We Consider Evidence*, 20 C.F.R. § 416.920b; *Evaluation of Disability of Adults, in General*, 20 C.F.R. § 416.920.

[87] 2015 Administrative Law Judge Decision, Docket No. 8 at 22, 25.

[88] *Id.*

[89] *Id.* at 23.

[90] *Id.*

[91] *Id.* at 32

[92] *Id.* at 6, 25.

[93] *Id.* at 31-33.

[94] *Id.* at 26-28.

[95] Office Visit Records of Dr. William Perry, Docket No. 8 at 471, 478-80.

[96] Report of Dr. William Armstrong, Docket No. 8 at 525.

[97] Report of Dr. George Hatfield, Docket No. 8 at 647.

[98] *See* Kare-in-Home Hospice Care Treatment Records, Docket No. 8 at 841-974.

[99] *See* Office Visit Records of Dr. William Perry, Docket No. 8 at 468-529; Medical Expense Reports from Fred's Pharmacy, Docket No. 8 at 322-36.

[100] *How We Evaluate Symptoms, Including Pain*, 20 C.F.R. § 416.929(c)(3)(iv).

[101] Medication List, Docket No. 8 at 347-51.

[102] Report of Dr. Jason Frischhertz, Docket No. 8 at 616.

[103] Webster's New World Medical Dictionary at 429 (3rd ed. 2009).

[104] 2015 Administrative Law Judge Decision, Docket No. 8 at 26.

[105] *See generally* Hospital Records, Docket No. 8 at 361-69, 375-467, 603-37, 686-839.

[106] Function Report, Docket No. 8 at 261-69; Transcript of Oral Hearing, Docket No. 8 at 65-118.

[107] Report of Registered Nurse Bailey Brown, Docket No. 8 at 385; Report of Dr. Kevin Cope, Docket No. 8 at 386.

[108] Report of Dr. Kevin Cope, Docket No. 8 at 387; Report of Dr. Dena Jackson, Docket No. 8 at 409.

[109] Report of Dr. Kirsten Hiller, Docket No. 606-08.

[110] Report of Dr. James Warnock, Docket No. 8 at 639.

[111] Report of Dr. Dallas Sorrell, Docket No. 8 at 709.

[112] Mississippi Baptist Medical Center Medical Records, Docket No. 8 at 715-17.

[113] Letter from Clinical Supervisor Jan Thompson, Docket No. 8 at 840.

[114] *See, e.g.,* Shayan Cheraghlou et al., *Restricting Symptoms Before and After Admission to Hospice*, 129.7 AM. J. OF MED. 754-e7 (2016); *see also U.S. ex rel Wood v. Southerncare, Inc.*, No. 3:09-CV-313-CWR-LRA, 20136 WL 1339375, at *1 (S.D. Miss. March 30, 2013); Frank Greve, *Many Patients Who Check into Hospices to Die, Don't*, MCCLATCHY NEWSPAPERS, June 11, 2007; Ina Jaffe, *Nearly 1 in 5 Hospice Patients Discharged While Still Alive*, NAT'L PUB. RADIO, Aug. 11, 2017.

[115] Report of Licensed Practical Nurse Deborah Crosby, Docket No. 8 at 967-74.

[116] *Id.*

[117] Report of Dr. Shunda Garner, Docket No. 8 at 748; OXFORD CONCISE MEDICAL DICTIONARY at 662 (9th ed. 2015).

[118] Transcript of Oral Hearing, Docket No. 8 at 65-118.

[119] December 2015 Administrative Law Judge Decision, Docket No. 8 at 22 (citing Docket No. 8 at 748).

[120] Report of Dr. Shunda Garner, Docket No. 8 at 748.

[121] December 2015 Administrative Law Judge Decision, Docket No. 8 at 27 (citing Docket No. 8 at 703).

[122] Report of Dr. William Harris, Docket No. 8 at 703.

[123] December 2015 Administrative Law Judge Decision, Docket No. 8 at 30.

[124] Weems Community Mental Health Center Medical Records, Docket No. 8 at 530-92, 594-603.

[125] *See* AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. Text Revision 2000) (explaining Global Assessment of Functioning scores); *see also Boyd v. Apfel*,

239 F.3d 698, 701 n.2 (5th Cir. 2001) (noting scores are a "standard measure" in disability cases); *Kneeland v. Berryhill*, 850 F.3d 749, 751 (5th Cir. 2017) (describing scores as evidence in a disability case).

[126] December 2015 Administrative Law Judge Decision, Docket No. 8 at 29-31.

[127] Report of Nurse Practitioner Pamela Watkins, Docket No. 8 at 363.

[128] December 2015 Administrative Law Judge Decision, Docket No. 8 at 30.

[129] *See, e.g.,* Report of Family Psychiatric Mental Health Nurse Practitioner Erica Flake, Docket No. 8 at 585; Report of Dr. Eric Davis, Docket No. 8 at 392.

[130] *See* Weems Community Mental Health Center Medical Records, Docket No. 8 at 530-92, 594-603.

[131] Report of Dr. William Harris, Docket No. 8 at 703; Report of Dr. William Perry, Docket No. 8 at 695.

[132] *Need to Follow Prescribed Treatment*, 20 C.F.R. § 416.930; *How We Will Determine Whether Your Drug Addiction or Alcoholism is a Contributing Factor Material to the Determination of Disability*, 20 C.F.R. § 416.935.

[133] December 2015 Administrative Law Judge Decision, Docket No. 8 at 30; *see also* Max Selver, *Disability Benefits and Addiction: Resolving an Uncertain Burden*, 91 N.Y.U. L. REV. 954, 988 (2016).

[134] *Evaluating Cases Involving Drug Addiction and Alcoholism (DAA)*, SSR 13-2p.

[135] *Evaluation of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statements*, SSR 96-7p, *superseded by Evaluation of Symptoms in Disability Claims,* SSR 16-3p (effective Mar. 28, 2016).

[136] *Evidence, Procedure, and Certification for Payments*, 42 U.S.C. § 405.

[137] Complaint, Docket No. 1 at 2; *see also* Motion for Summary Judgment, Docket No. 9.

[138] *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938))

[139] *Steadman v. S. E. C.*, 450 U.S. 91, 98 (1981).

[140] *See Dickinson*, 527 U.S. at 159; *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (quoting *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)).

[141] C. M. A. McCauliff, *Burdens of Proof: Degrees of Belief, Quanta of Evidence, Or Constitutional Guarantees*, 35 VAND. L. REV. 1293, 1329-30 (1982).

[142] *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 466, 488 (1951).

24

[143] *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[144] Docket No. 15.

[145] *Objection to Report and Recommendations*, Docket No. 16 at 2.

[146] *Universal Camera Corp.*, 340 U.S at 478.

[147] Fed. R. Civ. P. 72.

[148] *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Evidence, Procedure, and Certification for Payments*, 42 U.S.C. § 405(g).

[149] Application for Supplemental Security Income Benefits, Docket No. 8 at 232-37.

[150] *See* Doron Dorfman, *Re-Claiming Disability: Identity, Procedural Justice, and the Disability Determination Process*, 41 L. & SOC. INQUIRY 195 (2017); JoNel Newman, *Identity and Narrative: Turning Oppression into Client Empowerment in Social Security Disability Cases*, 79 ALB. L. REV. 373, 402 (2015); *see also* Laura L. Rovner, *Perpetuating Stigma: Client Identity in Disability Rights Litigation*, 2001 UTAH L. REV. 247, 273 (2001); Linda S. Durston & Linda G. Mills, *Toward A New Dynamic in Poverty Client Empowerment: The Rhetoric, Politics, and Therapeutics of Opening Statements in Social Security Disability Hearings*, 8 YALE J.L. & FEMINISM 119 (1996).

[151] *See* Hugo Benitez-Silva et al., *How Large Are the Classification Errors in the Social Security Disability Award Process?*, National Bureau of Economic Research Working Paper 10219 (2004).

[152] Terrance McCoy, *597 Days. And Still Waiting.*, WASH. POST, Nov. 20, 2017.

[153] Dorfman, *supra* n. 150 at 217.

[154] *Id.* at 218-19; *see also* Doron Dorfman, *Disability Identity in Conflict: Performativity in the U.S. Social Security Benefits System*, 38 T. JEFFERSON L. REV. 47 (2015).

[155] Dorfman, *supra* n. 150 at 216, 223; *see also* Samuel R. Bagenstos, *Disability, Universalism, Social Rights, and Citizenship*, 39 Cardozo L. Rev. 413, 429 (2017).

[156] *See* Joe Davidson, *Short Staffing Leads to Long Waits for Social Security Disability Hearing Decisions*, WASH. POST, Apr. 3, 2018.

[157] *See* McCoy, *supra* n. 152.

[158] *Id.*

[159] Eric Harwood, *I Lost Everything Waiting for Disability Assistance. And I'm Not The Only One*, WASH. POST, Sept. 25, 2017.

[160] *Id.*

[161] *Id.*

25

[162] Social Security Administration, SSI Annual Statistical Report, 2016 at 33 ([2017](#)).

[163] Dorfman, *supra* n. 150 at 223.

[164] Julie Turkewitz and Juliet Linderman, *The Disability Trap*, N.Y. Times, [Oct. 20, 2012](#); *see also When We Do Not Pay Benefits Because of a Disability Beneficiary's Work Activity*, 20 C.F.R. § 404.401a.

[165] Dorfman, *supra* n. 150 at 223.

[166] *See* Adrienne Asch, *Critical Race Theory, Feminism, and Disability: Reflections on Social Justice and Personal Identity*, 62 Ohio St. L.J. 391, 397 ([2001](#)).

[167] Dorfman, *supra* n. 150 at 210.

[168] *See* James I. Charlton, *Nothing About Us Without Us: Disability Oppression and Empowerment* (1998).

[169] *Beal v. Doe*, 432 U.S. 454, 462 (1977) (Marshall, J., dissenting).